In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-3064

PATRICIA PUNZIO,

*Plaintiff-Appellant,*

*v.*

MICHAEL J. ASTRUE, Commissioner
of Social Security,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 08 C 3179—**John W. Darrah**, *Judge.*

ARGUED MARCH 30, 2010—DECIDED JANUARY 21, 2011

Before POSNER, ROVNER, and TINDER, *Circuit Judges.*

ROVNER, *Circuit Judge.* Patricia Punzio has suffered
from mental illness for most of her adult life, but an
administrative law judge rejected her application for
disability benefits on the ground that her treating psy-
chiatrist's opinion about her mental limitations con-
flicts with the other medical evidence. To the contrary,
however, the treating psychiatrist's opinion is well sup-

ported not only by her own observations of Punzio but also by the record as a whole. And because a vocational expert confirmed that the mental limitations identified by the psychiatrist would preclude Punzio from working at any job, the only possible outcome was a finding that she is disabled. We reverse the district court's judgment in favor of the Commissioner of Social Security and remand the case to the agency for an award of benefits.

## I.

By any measure Punzio has led a difficult life. Her parents were alcoholics who treated her harshly. In the fifth grade she was sexually assaulted by her friend's grandfather and afterward attempted suicide. When she was in the sixth grade she started sneaking alcohol. In the classroom her progress was derailed by dyslexia, but her mother, afraid of the stigma, refused to let her be placed in a special-education program. Punzio dropped out of school after completing the eighth grade, although at some point she earned a GED. She drank heavily as a young adult until, at the age of 26, she stopped abusing alcohol after joining Alcoholics Anonymous, where she developed her most meaningful relationships. Still she possessed few marketable skills and had difficulty holding down a job. Her longest tenure was the four years she worked as a school custodian between 1994 and 1998.

Punzio's medical records pick up in April 1998 when, at the age of 40, she checked herself into a psychiatric

facility in Illinois. She had struggled with depression her whole life, she told her treating doctor, and recently had been seeing a counselor at the YWCA. When she arrived at the facility she already was taking the antidepressant Prozac and the mood stabilizer Depakote. But still her mental illness was unbearable, she said, and now she was afraid she might harm herself. She felt increasingly hopeless, she explained, and thought that perhaps she was "supposed to be dead." At first she made little progress, and during therapy sessions she was withdrawn and disclosed little about her feelings. Within a week, however, her suicidal thoughts subsided. Her doctors diagnosed her with major depression and, after determining that she was no longer a danger to herself, decided to transition her into a partial-hospitalization program, which would allow her to continue receiving intensive treatment during the day while spending the night at her home. They kept her on Depakote but switched her antidepressant to Effexor.

Over the next three weeks, Punzio participated in individual and group therapy sessions at the psychiatric facility. Her doctors observed that she appeared depressed and lethargic, but they also complimented her on her coherence and insight. She shared more details about the origins of her depression, explaining that her parents made her feel inadequate as a child and that now she worried about being a good mother to her son, who was then 11 years old and living with his father because Punzio was too depressed to take care of him. During this time a friend in Maryland offered Punzio a job and a place to stay, and she decided to take advantage of the opportunity to make a fresh start. Her

doctors approved and told her that her prognosis was good so long as she continued taking her medications and sought follow-up treatment in Maryland.

Yet within two months Punzio had returned to Illinois, still crippled by her depression. In July 1998 she was jointly evaluated by a psychiatrist and a social worker on behalf of the DuPage County Health Department. Her medications were ineffective, she told them, and she felt hopeless and worthless and as a result was unable to concentrate or sleep through the night. Nor could she ride her bike, go dancing, or take part in any of the other social activities that she used to enjoy. Instead she found herself overeating and had gained 50 pounds in recent months. Her evaluators opined that she was extremely depressed and probably bipolar. They increased her dosage of Effexor and arranged for her to receive counseling. In the months that followed, Punzio met with a therapist and worked with a psychiatrist to calibrate her dosage of Effexor. In February 1999, however, she quit taking her medications after concluding that the drugs were hindering her concentration and making her drowsy. But she continued to see a therapist at the YWCA on a weekly basis through August 2001.

Meanwhile, Punzio also was seeking treatment for additional ailments. In November 1998 an educational therapist diagnosed her with dyslexia and recommended that she undergo further testing for attention-deficit disorder. The therapist observed a number of dyslexic behaviors, like confusing vowels, reading syllables out of sequence, and omitting the last syllable of some words.

The therapist concluded that, although Punzio was intelligent, her potential had been impeded by her learning disability and emotional instability. When Punzio was tested for attention deficit disorder, however, the examining neurologist was unable to provide a conclusive diagnosis, explaining that the symptoms of attention-deficit disorder mimic the symptoms of depression. On top of it all, in October 2001 Punzio was diagnosed with advanced carpal-tunnel syndrome in both hands, and a few months later she had surgery to relieve the pressure on her nerves.

Throughout this time Punzio continued to struggle with her mental illness. For a few months at the end of 2002 she saw a licensed clinical professional counselor, who recommended that she consult a psychiatrist to resume her medications. The psychiatrist suggested the mood stabilizer Lamictal, but Punzio said she was wary of taking any medication because of a bad experience in the past; after doing some research, however, she agreed to give Lamictal a try, gradually increasing her dosage each week. A few weeks later the psychiatrist supplemented the regimen with Adderall to improve Punzio's memory and concentration. By the beginning of 2003, she told her counselor that both medications seemed to be working and that she felt "encouraged" about her progress. But soon thereafter Punzio lost her insurance and was unable to continue her appointments.

In July 2003 Punzio returned to the DuPage County Health Department to consult a psychiatrist. Initially her psychiatrist diagnosed her with bipolar disorder and

prescribed the antidepressant Wellbutrin. By August Punzio reported that she was feeling better than she had felt in years. She felt depressed only during tough encounters with her family, she told her psychiatrist, and at worst her symptoms lingered for only a few hours. Her psychiatrist cautioned, however, that Punzio would need to take her medications for the rest of her life. Indeed in October, when Punzio missed an appointment and ran out of her medications, her progress rapidly regressed. Even so, after going back on Adderall, Lamictal, and Wellbutrin, she showed improvement.

For at least four more years, Punzio continued to consult psychiatrists at the DuPage County Health Department, usually monthly. She did show some progress. Her drug regimen was stable, and she told one assigned doctor that she was active and able to function at home and in the community. But the severity of her symptoms continued to wax and wane with the changing seasons. During the fall, she said, she consistently became more depressed and unmotivated, although never to the point of feeling hopeless or suicidal. And there were more missed appointments and lapses in medications, which predictably worsened her condition. During the summer of 2004, Punzio was overwhelmed with worries about her son, by then a teenager, who had attempted suicide a few months earlier and had just been released from a rehabilitation center. To quell Punzio's anxiety, a psychiatrist at the county health department prescribed Buspar. The drug seemed to help, although the psychiatrist had to increase the dosage when Punzio reported that she still felt quite

nervous around crowds and sometimes felt daunted even by simple tasks like going to the store. In 2005 she occasionally suffered mood swings triggered by her inability to hold a job, but thanks to her medications these ups-and-downs were less severe than what she had experienced in the past. Yet she still experienced continuous frustration dealing with the limitations imposed by her dyslexia, as well as chronic problems with memory. In April 2006, for example, the county psychiatrist then managing her care observed that Punzio felt depressed because of her "cognitive deficits in areas of comprehension, retention of information, short-term memory, and dyslexia, which leads to spending an excessive amount of time on completing tasks."

In addition, from October 2005 until October 2006 Punzio returned to the YWCA and received weekly counseling. Her therapist attributed Punzio's psychological problems to the trauma she had experienced throughout her life. The therapist tried to help Punzio cope with those scars by exploring and understanding her past. The treatment notes reveal that Punzio spent much time discussing dysfunction in her family growing up. She also talked about developing healthy relationships and examined her feelings of guilt and anger. But the therapist lamented that poor memory and difficulty focusing were significantly impeding Punzio's progress, despite her impressive self-awareness and commitment to healing. The therapist concluded that Punzio's mental illness would prohibit her from holding down a job.

Punzio applied for disability benefits in April 2005, alleging an onset date of June 1997. After her application had been denied on initial review and on reconsideration, Punzio requested a hearing. She appeared before an administrative law judge in May 2007 and testified that she is unable to work. Although her mental condition has improved since she was hospitalized in 1998, she explained, there still are days when she does not want to leave her house, especially if she must confront a stressful social situation or will encounter a crowd of people. If forced to face these fears, Punzio said, she develops trouble breathing and feels like she is going to have an anxiety attack. (Indeed, testifying at the hearing seemed to push Punzio to the brink; the ALJ remarked that she was in tears throughout most of the session.) In addition, Punzio said, her depression is fed by her dyslexia and poor memory. She is unable to remember the opening paragraphs of a short letter by the time she finishes, she said, and usually she cannot even decipher her own writing because of the misplaced letters and phonetic spelling. She mixes up numbers too, especially telephone numbers. During the day, Punzio continued, she spends most of her time at home except when attending AA meetings, which she has done regularly during her 22 years of sobriety. Often she fiddles with her computer but has difficulty staying on task. She does little cleaning, she admitted, in part because she lacks motivation. And she does not often shop for groceries because she is averse to appearing in public and overwhelmed by the cornucopia of choices. Sometimes she drives short distances, but she has trouble finding her away around town and remembering directions.

The ALJ asked a vocational expert whether Punzio would be employable if her residual functional capacity restricts her to one-step or two-step processes without public contact or keyboarding but she can lift 10 pounds frequently and 20 pounds occasionally and sit or stand for six hours in a typical workday. The vocational expert replied that, with that residual functional capacity, Punzio could return to her past relevant work as a school custodian, which the vocational expert classified as light, unskilled work. In addition, the vocational expert continued, a person with this residual functional capacity would be able to do assembly and packing work in a factory. Punzio's lawyer asked the vocational expert whether her client could perform her past relevant work if, in addition to the limitations listed by the ALJ, she also has moderate restrictions in her abilities to stay on task and to understand and remember short instructions and was likely to miss work at least three days a month. The lawyer defined the term "moderate restriction" to mean an inability to perform the skill in question between 20 percent and 30 percent of the time. The vocational expert acknowledged that any one of these moderate restrictions would be "well beyond" what is tolerated for unskilled laborers. In fact, he said, there are no jobs in the national economy available to a person with these limitations.

Throughout the hearing the ALJ commented on gaps in Punzio's medical history and admonished her lawyer to supplement the record. In particular the ALJ expressed skepticism that the medical evidence supported the moderate restrictions that the lawyer had

identified to the vocational expert. The lawyer promised to submit additional evidence to demonstrate Punzio's functional limitations and accordingly solicited an opinion about Punzio's mental residual functional capacity from Samar Mahmood, who was then her treating psychiatrist at the DuPage County Health Department. When Dr. Mahmood assessed Punzio in July 2007, she had been treating her for about seven months. Dr. Mahmood based her evaluation not only on her own treatment notes but also on the observations of colleagues who treated Punzio at the county health department before she took over her care in December 2006. Dr. Mahmood reported that Punzio's bipolar disorder, depression, and attention-deficit disorder were sapping her energy and had led to diminished interest in almost all activities, difficulty thinking and concentrating, impaired memory, and persistent anxiety. As a result, Dr. Mahmood opined, Punzio had been unable since July 2003 to meet competitive standards in three mental abilities necessary to perform unskilled work: remembering work procedures, understanding and remembering detailed instructions, and carrying out detailed instructions. In addition Dr. Mahmood opined that Punzio's abilities to understand and remember short instructions and to maintain attention for a two-hour segment were seriously limited and less than satisfactory. Finally Dr. Mahmood opined that Punzio's mental impairments would cause her to miss work at least three days each month. When Punzio submitted Dr. Mahmood's evaluation to the ALJ, her lawyer offered to modify the alleged onset date to July 2003.

The ALJ considered the new evidence but nevertheless found that Punzio could return to her job as a school custodian and accordingly denied her application for benefits. At step two the ALJ found that Punzio suffers from bipolar disorder and carpal-tunnel syndrome, both impairments being severe. At step three, however, the ALJ concluded that these impairments do not meet or medically equal a listed impairment. The ALJ further concluded that Punzio retains the functional capacity to perform some light work, including her former job as a school custodian. This conclusion coincides with the limited restrictions included in the hypothetical the ALJ framed for the vocational expert; the ALJ ignored the vocational expert's testimony that no job exists for Punzio—that she is disabled—if Dr. Mahmood's assessment of her mental residual functional capacity is accurate. The ALJ explained that he gave no weight to Dr. Mahmood's assessment because it had been "solicited by claimant's attorney with the purpose of assisting her in her pursuit of disability benefits" and, in the ALJ's view, was inconsistent with her earlier treatment notes. The ALJ gave the same explanation for rejecting the YWCA therapist's opinion that Punzio's mental illness precludes her from working. And in a single sentence the ALJ rejected as "not entirely credible" Punzio's testimony about the limitations caused by her depression; her testimony, the ALJ offered, is not supported by the "evidence of the record taken as a whole."

**II.**

Punzio raises a host of issues on appeal, among them that the ALJ gave no explanation whatsoever for finding her testimony not credible. On this point Punzio is correct; to read the ALJ's boilerplate credibility assessment is enough to know that it is inadequate and not supported by substantial evidence. That is reason enough for us to reverse the judgment, *see McClesky v. Astrue*, 606 F.3d 351, 352-53 (7th Cir. 2010); *Genier v. Astrue*, 606 F.3d 46, 50 (2d Cir. 2010); *Villano v. Astrue*, 556 F.3d 558, 562-63 (7th Cir. 2009) (per curiam), although another striking error of greater significance compels us to soldier on: The ALJ erred in rejecting Dr. Mahmood's assessment of Punzio's mental residual functional capacity. That opinion, if credited, would compel a finding that Punzio is disabled. Dr. Mahmood opined that Punzio is sufficiently limited in her ability to understand, remember, and carry out detailed instructions such that she is unable to meet competitive standards for unskilled work. She also opined that Punzio's abilities to understand and remember short instructions and to maintain attention for a two-hour segment were seriously limited and less than satisfactory. And she further opined that Punzio will miss at least three days of work each month. No one contradicted Dr. Mahmood. And the vocational expert testified that a person with these limitations will not be able to find any work in the national economy. *See also Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009) (per curiam) (recounting vocational expert's testimony that claimant who is either "off pace ten percent of the time" or "absent more than

two days per month" will not be able to perform unskilled work).

An ALJ must give "controlling weight" to a treating source's opinion if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence." 20 C.F.R. § 404.1527(d)(2); *see also Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010) (per curiam); *Poupore v. Astrue*, 566 F.3d 303, 307 (2d Cir. 2009) (per curiam); *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008). And whenever an ALJ does reject a treating source's opinion, a sound explanation must be given for that decision. 20 C.F.R. § 404.1527(d)(2); *Campbell v. Astrue*, No. 10-1314, 2010 WL 4923566, at *6 (7th Cir. Dec. 6, 2010); *Cowan v. Astrue*, 552 F.3d 1182, 1188 (10th Cir. 2008); *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1199 (9th Cir. 2008); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007). In Punzio's case the ALJ did not cast doubt on Dr. Mahmood's diagnostic techniques; instead the ALJ charged that Dr. Mahmood's assessment of Punzio's mental residual functional capacity contradicted her treatment notes and in any event could be cast aside because Punzio's lawyer had solicited the assessment. Neither of these reasons is sound.

Far from being inconsistent with her treatment notes, Dr. Mahmood's assessment is amply supported not only by her own experience with Punzio but also by the medical records compiled by other treating sources over many years. The ALJ cited two pieces of evidence to support his contrary conclusion. When Dr. Mahmood

had seen Punzio in March 2007, she assigned her a GAF score of 60; that rating, the ALJ concluded, was "inconsistent with [her] current rating of claimant's functioning, with serious limitations noted in most areas." But by cherry-picking Dr. Mahmood's file to locate a single treatment note that purportedly undermines her overall assessment of Punzio's functional limitations, the ALJ demonstrated a fundamental, but regrettably all-too-common, misunderstanding of mental illness. *See, e.g., Spiva v. Astrue*, No. 10-2083, 2010 WL 4923563, at *1 (7th Cir. Dec. 6, 2010); *Parker v. Astrue*, 597 F.3d 920, 924-25 (7th Cir. 2010); *Pate-Fires v. Astrue*, 564 F.3d 935, 944-45 (8th Cir. 2009); *Wilder v. Chater*, 64 F.3d 335, 336-37 (7th Cir. 1995). As we have explained before, a person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about her overall condition. *See Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010); *Wilson v. Astrue*, 493 F.3d 965, 967-68 (8th Cir. 2007); *Kangail v. Barnhart*, 454 F.3d 627, 629 (7th Cir. 2006). The ALJ ought to have analyzed whether Dr. Mahmood's mental-residual-functional-capacity questionnaire was consistent with her treatment notes as a whole. Even if we accept the March 2007 treatment note as evidence that Punzio enjoys a few "good days," that evidence still offers no support for the ALJ's finding that her mental illness does not prevent her from holding a job. After all, the vocational expert testified that no employer would hire Punzio to perform unskilled work if her mental illness limits her abilities even just 20 percent of the time—or if she experiences as few as three "bad days" a month that

cause her to miss work. *See Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008); *Watson v. Barnhart*, 288 F.3d 212, 217-18 (5th Cir. 2002); *Washington v. Shalala*, 37 F.3d 1437, 1442-43 (10th Cir. 1994).

But in fact the ALJ's error runs even deeper because the March 2007 treatment note is *not* inconsistent with the July 2007 assessment. A GAF score of 60 means that, in March 2007, Punzio was either exhibiting moderate symptoms of mental illness or experiencing moderate difficulty in social, occupational, or school functioning. *See* DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed. 2000); *see also Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (per curiam) (explaining that GAF scores measure both severity of symptoms and functional level but that the final score represents only the worse of the two ratings). Dr. Mahmood employed a different scale, however, when she assessed Punzio's mental residual functional capacity in July 2007. In evaluating Punzio's mental abilities necessary to do unskilled work, Dr. Mahmood was asked to assign one of five predetermined ratings ranging from "unlimited or very good" to "no useful ability to function." She rated almost all Punzio's abilities in the middle category, "seriously limited, but not precluded," which, the questionnaire elaborates, means that in these areas Punzio's abilities are "less than satisfactory." But remember that, at Punzio's hearing, her lawyer and the vocational expert defined a moderate limitation to mean an inability to perform to competitive standards between 20 percent and 30 percent of the time—and that the vocational expert explained that a moderate limitation would be

"well beyond what's tolerated in unskilled work." In other words, Dr. Mahmood's March 2007 assessment that Punzio was moderately limited in occupational functioning is not at odds with her July 2007 observation that, in most of the abilities required to hold down an unskilled job, Punzio's performance would be "less than satisfactory."

The ALJ also reasoned that "the longitudinal record" offers "no support" for Dr. Mahmood's opinion in July 2007 that Punzio's mental limitations will cause frequent absenteeism. But just three sentences earlier the ALJ had written that Punzio "first saw Dr. Mahmood at the Walk-In Clinic on December 1, 2006, after [she] missed her appointment." Indeed the psychiatric treatment notes are replete with references to missed appointments. For example, two months before the missed appointment with Dr. Mahmood, Punzio had been a no-show for an appointment with her previous psychiatrist at the county health department. And she had missed two additional appointments between November 2005 and February 2006, chalking it up to "forgetfulness during the holiday season." Even worse, between July 2004 and October 2004 Punzio had missed two more appointments, which caused her medications to run out. As a result she tailspinned and was plagued by low energy, low motivation, forgetfulness, and an inability to concentrate. Punzio's records from the county health department show that her inability to keep appointments is both a symptom of her mental illness and an aggravating factor. Thus, Dr. Mahmood's con-

clusion about her propensity for absenteeism is adequately supported by her and her colleagues' experiences.

And likewise the record adequately supports Dr. Mahmood's conclusion that Punzio is seriously limited in her abilities to understand and remember short instructions and to maintain attention for a two-hour segment. In fact Punzio's poor comprehension skills appear to be part and parcel of her mental illness. Recall that in November 1998 an educational therapist diagnosed Punzio with dyslexia after observing her confusing vowels, reading syllables out of sequence, and omitting the last syllable of some words. Indeed the educational therapist reasoned that Punzio's dyslexia was aggravated by her depression; more recently her psychiatrists at the county health department reached the same conclusion. Her therapist at the YWCA remarked that Punzio's poor memory and difficulty focusing would hinder her ability to tackle her mental illness. And then there is Punzio's own testimony about her difficulties staying on task and even remembering what she had just read; going through these ordeals made her even more depressed, she explained. The ALJ declared this testimony "not entirely credible," but we have said already that this unexplained finding is unsustainable. Rather than addressing Punzio's comprehension skills directly, the ALJ instead surmised that her condition has improved over the years, that she no longer is suicidal, that her symptoms typically persist for only a few hours, and that she is "managing activities of daily living without significant difficulty." We have no way of knowing whether these observations

explain the ALJ's adverse credibility finding, but we are confident that each point is either unsupported or irrelevant. We cannot fathom how the ALJ determined that Punzio experiences no significant difficulty in managing activities of daily living. Certainly the ALJ cited no evidence on this point. But even if he plucked the phrase from one of Punzio's treatment notes, her ability to struggle through the activities of daily living does not mean that she can manage the requirements of a modern workplace. *See Spiva*, 2010 WL 4923563, at *5; *Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005); *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 918 (7th Cir. 2003). In any event the ALJ's assertion is at odds with the medical evidence as a whole, which shows constant bouts of anxiety wrought by even the simplest social situations. And the fact that Punzio is no longer suicidal and is not plagued by depression 24 hours a day says little about her abilities to understand and remember short instructions and to maintain attention for a two-hour segment. *See Holohan v. Massanari*, 246 F.3d 1195, 1205 (9th Cir. 2001) ("That a person who suffers from severe panic attacks, anxiety, and depression makes some improvement does not mean that the person's impairments no longer seriously affect her ability to function in a workplace."). Concluding that the claimant "is not a raving maniac who needs to be locked up" is a far cry from concluding that she suffers no limits on her ability to function. *See Bauer*, 532 F.3d at 608-09.

As for the ALJ's second reason for rejecting Dr. Mahmood's opinion (as well as the opinion of the

YWCA therapist), the fact that relevant evidence has been solicited by the claimant or her representative is not a sufficient justification to belittle or ignore that evidence. *See Moss v. Astrue*, 555 F.3d 556, 560-61 (7th Cir. 2009) (per curiam); *Reddick v. Chater*, 157 F.3d 715, 726 (9th Cir. 1998). Quite the contrary, in fact. The claimant bears the burden of submitting medical evidence establishing her impairments and her residual functional capacity. 20 C.F.R. §§ 404.1512(a), (c), 404.1513(a), (b), 404.1545(a)(3). How else can she carry this burden other than by asking her doctor to weigh in? Yet rather than forcing the ALJ to wade through a morass of medical records, why not ask the doctor to lay out in plain language exactly what it is that the claimant's condition prevents her from doing? Indeed the regulations endorse this focused inquiry. *See id.* § 404.1513(b)(6) (requesting from claimant "a medical source statement about what you can still do despite your impairment(s)"); *id.* § 404.1545(a)(3) ("We will consider any statements about what you can still do that have been provided by medical sources . . . ."); *see also id.* (permitting claimant to submit "descriptions and observations" about her functional limitations from "family, neighbors, friends, or other persons"). And in the "Best Practices" section of its website, the Social Security Administration recognizes the value of this approach by urging claimants and their representatives to submit a doctor's statement that explicitly "identifies the limitations imposed by the claimant's impairments." *See Best Practices for Claimants' Representatives*, SOCIAL SECURITY ONLINE, http://www. socialsecurity.gov/appeals/best_practices.html (last visited

Dec. 21, 2010). Of course a treating source's opinion can be a mixed bag. On the one hand, the treating source likely has spent more time with the claimant than any other doctor and thus has a better understanding of her condition. On the other hand, the treating source may not be an expert on the claimant's condition and, at worst, may "bend over backwards to assist a patient in obtaining benefits." *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006); *see also Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001); *Stephens v. Heckler*, 766 F.2d 284, 289 (7th Cir. 1985). But these are the very concerns that the searching inquiry set forth in 20 C.F.R. § 404.1527(d)(2) is designed to address. The ALJ's examination whether the treating source's opinion is both well supported by medically acceptable diagnostic techniques and consistent with the other evidence in the record will weed out those doctors who are either poorly versed in their patient's condition or unable to opine objectively. And if indeed the treating source's opinion passes muster under § 404.1527(d)(2), then "there is no basis on which the administrative law judge, who is not a physician, could refuse to accept it." *Hofslien*, 439 F.3d at 376.

Dr. Mahmood's assessment of Punzio's mental residual functional capacity is well supported and consistent with the medical evidence, so it must carry the day. And because the record does not contain a conflicting opinion, we need not prolong these proceedings any further. Given Dr. Mahmood's assessment and the vocational expert's testimony that no jobs in the national economy can be filled by a person with Punzio's mental limitations, the only possible outcome is a finding that

Punzio has been disabled since July 2003. *See* 42 U.S.C. § 405(g); *Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 357-58 (3d Cir. 2008); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 355 (7th Cir. 2005); *Benecke v. Barnhart*, 379 F.3d 587, 594-96 (9th Cir. 2004). We reverse the district court's judgment in favor of the Commissioner and remand to the agency for an award of benefits.