NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

For the Seventh Circuit
Chicago, Illinois 60604

Argued January 28, 2014
Decided June 16, 2014

**Before**

DIANE P. WOOD, *Chief Judge*

FRANK H. EASTERBROOK, *Circuit Judge*

MICHAEL S. KANNE, *Circuit Judge*

| | |
|---|---|
| No. 13-2529 | Appeal from the United States District Court for the Northern District of Indiana, South Bend Division. |
| TAMMY A. SAMBROOKS,<br>        *Plaintiff-Appellant*, | |
| | No. 3:12-CV-460 WCL |
| *v.* | |
| | **William C. Lee,** *Judge.* |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security,<br>        *Defendant-Appellee*. | |

**O R D E R**

Tammy Sambrooks has been seeking disability benefits and supplemental security income from the Social Security Administration since 2009. She failed to convince the agency's Administrative Law Judge that her mental health and physical ailments rendered her disabled, however, and so she turned to the courts. The district court ruled in the agency's favor, and that result may ultimately prove to be sustainable. Our

concern is that the ALJ did not adequately explain why he rejected the opinions of three treating physicians and justified his decision instead on factors that do not appear to support his finding. We therefore reverse the district court's judgment and remand this case to the Commissioner for further proceedings.

## I

Sambrooks worked in clerical positions for many years, but since August 2009 she has not held a job. In late 2009 she filed an application for disability and supplemental security benefits with the Social Security Administration, alleging that as of August 1, 2009, she has been unable to work. Her primary complaint is bipolar disorder, but she also has a variety of physical ailments, including morbid obesity, severe lower back pain, knee and hip pain, and frequent migraine headaches. A year after her application, she seriously injured her neck in a car accident. Based on her employment records, her date last insured (that is, the date by which she must show her disability arose in order to be eligible for disability benefits) is December 31, 2013.

The record showed that Sambrooks not only suffered from mental health problems, but that she also had trouble complying with the law. Her primary psychiatric symptoms are depressed mood, inability to sleep, anxiety, and trouble concentrating and remembering. She has engaged in illegal behavior, including shoplifting and drug abuse. When she was arrested for shoplifting in 2009, she sought treatment at a mental health center, where she admitted that she had shoplifted more than 100 additional times. She admitted to weekly use of cocaine, although she claimed to have abstained for the last year. She also said that she believed she was addicted to pain medications. At a later appointment at the center, she added inability to keep her temper, panic attacks, poor sleep, and nightmares to the list of her problems. The psychiatrist diagnosed her with bipolar disorder and generalized anxiety disorder and assigned her a Global Assessment of Functioning (GAF) score of 45.

On the physical side, Sambrooks's primary complaint was lower back pain, which she reported began in 2006. Two years later, her family doctor, James Carroll, diagnosed her with degenerative disc disease. Dr. Carroll submitted a questionnaire in March 2010 to the agency, in which he reported that he based his diagnosis on both Sambrooks's complaints and on diagnostic tests (perhaps x-rays – it is hard to tell from the form). Dr. Carroll gave a pessimistic assessment of Sambrooks's ability to function: he opined that she could not sit, stand, or walk for even one hour in an eight-hour workday; that she would need a 30-minute break after 30 minutes of work; that she could lift only five pounds, and only occasionally; and that she was markedly limited in her ability to grasp, turn, or twist objects, to use her arms to reach, and to tolerate even low stress.

With all these problems, he estimated that she would miss work more than three times per month.

In October 2009 Sambrooks moved to Indiana, where she sought treatment from Dr. William Forgery. He initially prescribed pain medication for her, but he later discovered evidence that she might have been abusing the system by obtaining medication from several doctors at the same time. He wrote a letter to the state agency in February 2010 in which he stated that he could not support her claim of disability because of doubts about her credibility.

In March 2010, the state agency had Sambrooks evaluated by Patrick McKian, a psychologist, and Dr. Kanayo Odeluga, a physician. McKian diagnosed her with bipolar disorder and assigned a GAF score of 50. Dr. Odeluga concluded that she was morbidly obese (at the time, she stood 5′3″ and weighed 250 pounds, for a body mass index of 44.3), and that she suffered from lumbar disc disease. He thought that osteoarthritis might be the cause of her knee pain.

Later that month, two state-agency consultants reviewed Sambrooks's medical records; they did not examine her. In their opinion, she was able to work. The consulting psychologist, J. Gange, concluded that she was able to perform simple tasks on a routine basis because it appeared that she helped with her children and did some household chores. He also noted that Dr. Forgey's letter raised a question about her credibility, but he did not specify whether he thought that undermined the underlying diagnosis of bipolar disorder or the symptoms she reported. The consulting physician, Dr. J. V. Corcoran, deduced from the records that Sambrooks could lift 10 pounds frequently and 20 pounds occasionally, and that she could sit, stand, or walk for six hours out of an eight-hour workday. He acknowledged Dr. Carroll's disagreement with these numbers, but he asserted that Dr. Forgey's suspicion of her abuse of prescription drugs caused him to question her reported pain and incapacitation. The state agency denied her application for benefits in April 2010. After her request for reconsideration was denied, she asked for a hearing before an ALJ.

Shortly after the state agency's action, in May 2010, Sambrooks injured her neck when her car was rear-ended by a semi-truck. This led an orthopedic surgeon to order an MRI, which revealed that she had a herniated disc "with spondyloses abutting the anterior surface of the cord." The surgeon recommended surgery, prescribed a pain killer, and referred her to a facility for epidural injections. She received several such injections, but by September he reported that they were not relieving her pain. She turned for help to Dr. Michael Kelly, a family physician. Dr. Kelly thought that her MRI showed "significant pathology" of the cervical and lumbosacral spine, and he

recommended treatment at a spine clinic. He also agreed to renew her psychiatric medications, including Xanax, but he referred her to a psychiatrist to ensure proper treatment.

In October 2010 Sambrooks saw psychiatrist Dewnzar Howard, who confirmed (again) the diagnosis of bipolar disorder and prescribed three medications, including Xanax. He concluded at a later visit that she was moderately depressed. Unfortunately, Sambrooks appears to have lied to Dr. Kelly, telling him that she had *not* seen a psychiatrist because she could not afford to do so; Dr. Kelly therefore continued her Xanax prescription, though at a lower dosage. She also reported tingling and numbness in her right arm and said that she was considering back surgery. Eight days later, back with Dr. Howard, she again lied, telling him that she was recovering from surgery. He kept her on the same medications. Neither Dr. Kelly nor Dr. Howard seems to have known about the deceptions or about Dr. Forgey's alert.

Sambrooks had her hearing before the ALJ in March 2011. Both Dr. Kelly and Dr. Howard stated that she could not work. Dr. Kelly, who had treated her five times between September and March, noted that she had "chronic, radiating pain" in her back that he estimated as an 8 on a 10-point scale. The herniated disc caused her tingling and numbness in her arm and into her thumb, and he believed that any repetitive reaching, handling, fingering, or lifting would cause her pain. He also noted that she had a bulging disc in her lower back, as well as degenerative disc disease. By his estimate, she could lift five pounds occasionally, and she could sit for only one hour in an eight-hour workday. Dr. Howard's assessment was similar. He believed that she had marked limitations in sustained concentration and persistence, understanding and memory, social interactions, and ability to adapt to changes in the workplace. Her psychiatric condition, he noted, could exacerbate her physical problems, and she could not tolerate even low stress. Like Dr. Carroll, he estimated that if she had a full-time job, she would miss more than three days per month.

At the hearing, Sambrooks was forced to clarify a number of points. She confirmed that she had not undergone surgery, and after an initial denial, she admitted that she had used cocaine and marijuana in the past. She denied recent use, and she denied abusing prescription drugs. No one questioned her about Dr. Forgey's letter or about the state consultants' use of his letter. Nor did anyone press her about her lies to Drs. Kelly and Howard.

In April 2011, after the hearing, Sambrooks sought treatment from Dr. Daniel Cha for her neck pain. Her report of her medical history included the statement that she had had surgery in November 2010 that made the neck pain worse, and the

misrepresentation that she did not have a psychiatrist. Dr. Cha examined her, reviewed the June 2010 MRI results, and prescribed pain medication. He also scheduled a "diagnostic cervical medial branch block," which he described as a procedure to numb some nerves in her neck to determine whether degenerative arthritis was contributing significantly to her pain. He apparently performed that procedure and concluded that arthritis was a major factor. Upon his recommendation, Sambrooks underwent "radiofrequency ablation" on those nerves. (This appears to involve zapping nerves with high-frequency radio waves to destroy their ability to transmit pain signals to the brain.)

Shortly after that procedure, Sambrooks learned that the ALJ had ruled that she was not disabled. Applying the familiar five-step evaluation process, the ALJ concluded (1) that she had not engaged in substantial gainful activity since her August 2009 onset date; (2) that her bipolar disorder, major depressive disorder, and degenerative disc disease were all severe impairments; (3) and that she was not disabled under any of the listings. At that point, the ALJ had to assess her residual functional capacity. In doing so, the judge concluded that the opinions of Drs. Carroll, Kelly, and Howard were entitled to little weight because they were not supported by "medical" evidence and they were contradicted by Sambrooks's description of her daily activities. The judge relied instead on the opinions of the two non-examining consultants. With respect to Sambrooks's credibility, the ALJ used an often-criticized formula, finding that her "statements concerning the intensity, persistence and limiting effects of [her alleged] symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." The judge went out of his way to say that this credibility determination was made "independent of Dr. Forgey's opinion" and without considering Sambrooks's lies under oath about her past drug use. Instead, he based his credibility ruling on three other points: the inconsistency he perceived between her daily activities and her asserted limitations; her inconsistent statements about the onset of her back pain; and "the lack of objective medical evidence" relating to the degenerative disc disease. The ALJ concluded that Sambrooks's residual functional capacity was sufficient for light work with certain restrictions, and that there were enough jobs in the regional economy that she could perform to justify the finding of "not disabled."

Sambrooks appealed the ALJ's decision to the Appeals Council. Before it decided her case, she sought additional treatment from Dr. Cha. Although the ablation procedure had initially provided some relief for her, by February 2012 her severe neck pain had returned, and Dr. Cha recommended another round. It is unclear whether she followed through with that treatment or what how successful it was. In June 2012, the Appeals Council added this additional evidence to the record but denied her request for

review. She sought review in the district court, see 42 U.S.C. § 405(g), but it upheld the Commissioner's decision.

## II

Sambrooks's primary argument on appeal is that the ALJ failed to provide an adequate explanation for his disregard of the opinions of her treating physicians. She notes, correctly, that the opinion of a treating doctor generally is entitled to controlling weight if it is consistent with the record, and in any event it cannot be rejected without a "sound explanation." *Jelinek v. Astrue,* 662 F.3d 805, 811 (7th Cir. 2011); *Punzio v. Astrue,* 630 F.3d 704, 710 (7th Cir. 2011).

The ALJ had very little to say about Dr. Kelly, one way or the other. He criticized the questionnaire filled out by Dr. Kelly and his assistant that reported that Sambrooks had a "marked" limitation in her ability to grasp, turn and twist objects, perform fine manipulations, and use her arms for reaching. But the ALJ's stated reason for his skepticism was that he saw "no objective evidence of any impairment that would cause 'marked' manipulative restrictions" – he found only evidence of "complaints of wrist pain" and "diminished grip strength." That is not an accurate representation of the record. Sambrooks complained about chronic, radiating pain in her neck that was not responsive to medication; she reported pain, tingling, and numbness down her right arm and into her hand; and she had decreased grip strength in both hands. Dr. Kelly opined that these symptoms were caused by a herniated disc affecting her spinal cord, and he thought that repetitive use of her hands and arms would cause her pain. The MRI showed that she indeed had a herniated disc. The ALJ did not attempt to reconcile that evidence with his opinion, nor did he point to any other evidence (medical, testimonial, or otherwise) that would undermine Dr. Kelly's assessment. Even if one might dig something out of the record, neither the government nor we are entitled to re-write the ALJ's opinion. See *Securities and Exchange Comm'n v. Chenery Corp.,* 318 U.S. 80, 87 (1943).

The ALJ buttressed his rejection of Dr. Kelly's opinion with the observation that Sambrooks's daily activities (which included meal preparation, grocery shopping, and light house-cleaning) demonstrated that she could stand for more than an hour at a time, lift and carry weights in excess of five pounds, and perform gross and fine manipulations. But doing that kind of housework does not show, without more, that the claimant is capable of work. See *Roddy v. Astrue,* 705 F.3d 631, 639 (7th Cir. 2013). More importantly, the ALJ omitted important qualifications Sambrooks noted. Her "cooking" amounted to heating frozen dinners or making sandwiches. She went to the grocery

store only with her husband. And she inserted her light cleaning into short periods of time when she was able to get out of bed.

The ALJ finally criticized Dr. Kelly's opinion because it said that Sambrooks's limitations began in May 2010, after the car accident, rather than in August 2009, her alleged onset date. There is a benign explanation for that, however: Sambrooks did not see Dr. Kelly until four months after the accident. No one asked Dr. Kelly to offer an opinion about her impairments before May 2010. Moreover, Sambrooks was insured through 2013, and so the fact that she injured her neck after her alleged onset date does not affect her eligibility for benefits (though it might affect the onset date).

The ALJ's rejection of Dr. Howard's opinion is similarly difficult to follow. Dr. Howard, recall, gave Sambrooks a GAF score of 60, which indicates "moderate" symptoms or difficulty functioning. See DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed. 2000). The ALJ thought this contradicted Dr. Howard's view that Sambrooks was "markedly" limited in some areas and unable to work. But a GAF score is nothing more than a snapshot of a particular moment. See *Punzio*, 630 F.3d at 710–11. For Dr. Howard, a psychiatrist, the GAF score was only one piece of data that he factored into his ultimate opinion. It is worth noting, too, that 60 was a high score for Sambrooks. On other occasions, as we have noted above, she received a 45 and a 50, both scores indicating "serious" symptoms or impairment in functioning. The ALJ did not explain why he chose not to take those scores into account when he rejected Dr. Howard's opinion.

Finally, the ALJ rejected Dr. Carroll's opinion for reasons that are hard to follow. Dr. Carroll's opinion is hard to read, and he described surprising limitations in it, such as the grasping and manipulation problems that Sambrooks developed after the neck injury (which had not yet occurred at the time he was treating her). It is unclear, also, why Dr. Carroll included a number of environmental restrictions in his assessment. Nevertheless, there are other aspects of his opinion that are supported by objective evidence in the record. For example, Dr. Carroll diagnosed Sambrooks with degenerative disc disease, and Dr. Kelly concluded that the MRI taken later showed degeneration and a bulging disc in her lower back. Based on that MRI, she received epidural injections for her neck and lower back pain. Once again, the ALJ did not explain his reason for apparently disregarding or rejecting this evidence (we do not know which).

After his quick rejection of the treating physicians, the ALJ turned to the two state-agency consultants (who never saw Sambrooks) and decided to rely heavily on their opinions. Relying heavily on Dr. Forgey's report that Sambrooks was getting pain

medications from several doctors at the same time, Dr. Corcoran decided that her physical impairments were not disabling. The ALJ, however, said that he did *not* put any weight on the Forgey letter. Worse, Dr. Corcoran evaluated her application before the neck injury, and so his opinion has limited relevance. Dr. Gange also found no disability based on mental health, but he relied on both the Forgey letter and the incomplete report of her home activities.

The ALJ also gave some additional reasons for finding that Sambrooks was not credible. First, he noted that she cared for young children at home. He did not, however, acknowledge that she was not doing this on her own; she was helped by both her mother-in-law and her husband. Next, the ALJ thought that she made inconsistent statements about her back pain, but in doing so he seems not to have distinguished between the back and the neck pain and what gave rise to each one. Third, he complained about a lack of objective medical evidence, without acknowledging the evidence of degenerative disc disease, the bulging disc, and the herniated disc in her neck. Finally, he thought that she made inconsistent statements about her hobbies and interests.

Taking all of this into account, we find ourselves unable to follow the ALJ's reasons for finding that Sambrooks is not disabled. This does not mean that the ALJ should have found her credible: to the contrary, there are many reasons in this record pointing in the opposite direction. The problem is the *Chenery* one: the ALJ did not rely on those reasons for rejecting her application, and the reasons the ALJ gave do not stand up under even our limited scrutiny. We therefore REVERSE the district court's judgment upholding the agency's determination and REMAND the case to the Commissioner for further proceedings consistent with this order.