Betty JOHNSTONE, Plaintiff,

v.

Michael J. ASTRUE, Commissioner for Social Security, Defendant.

Case No. 10–C–1122.

United States District Court, E.D. Wisconsin.

Jan. 23, 2012.

David G. Dreis, Milwaukee, WI, for Plaintiff.

Brian E. Pawlak, United States Department of Justice, Milwaukee, WI, for Defendant.

## DECISION AND ORDER

WILLIAM E. CALLAHAN, JR.,
United States Magistrate Judge.

### I. NATURE OF THE CASE

On December 13, 2010, Betty B. Johnstone ("Johnstone" or "plaintiff") commenced this action, seeking judicial review of the Commissioner's final decision denying her benefits pursuant to 42 U.S.C. § 405(g). The parties have consented to United States magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c) and General L.R. 73 (E.D.Wis.).

### II. PROCEDURAL HISTORY

Johnstone applied for Social Security Disability Insurance benefits on November 19, 2006, with an onset date of March 5, 2004. (Tr. 228–30; 128.) Her date last insured is December 31, 2009. (Tr. 140.) The Social Security Administration denied her claim based on her initial application and upon reconsideration. (Tr. 75; 81.) Johnstone then filed a request for a hearing before an Administrative Law Judge ("ALJ"). The request was granted and a hearing was set for December 29, 2009, before ALJ Wayne L. Ritter. (Tr. 95–99.) On January 22, 2010, ALJ Ritter denied Johnstone's application. (Tr. 27.) On November 30, 2010, the Appeals Council denied Johnstone's request for review. (Tr. 1.)

Johnstone now seeks judicial review of the Commissioner's final decision to deny benefits pursuant to 42 U.S.C. § 405(g).

### III. BACKGROUND

This section includes a summary of (1) Johnstone's testimony; (2) Johnstone's medical record; (3) the testimony of the Vocation Expert ("VE") from the December 29, 2009 hearing; and (4) the ALJ's decision.

## A. Johnstone's Testimony

Johnstone testified that she cared for her elderly mother from 2003, until her death in October 2009. (Tr. 42.) Her mother was legally blind and suffered from the residual effects of two strokes. (Tr. 43.) Additionally, Johnstone's two adult sons, ages 31 and 35, lived with her for a short time, but have since moved out. (Tr. 43.) The older son moved out in 2005, and the younger son moved out in 2006 or 2007. (Tr. 44–45.) She did not provide special care for her sons, but Johnstone did the laundry and provided their food. (Tr. 43.)

Up until March 2004, Johnstone held a position as a payment processing specialist, in which she analyzed insurance payments and posted the payments to the charges on a patient's account. (Tr. 50.) Johnstone began having accuracy problems with her work, suffered from sleepiness, and had difficulty concentrating. (Tr. 52–53.) Her anxiety caused her to become frustrated with her work and required her to take frequent breaks. (Tr. 53.) Additionally, she missed work approximately three days a month due to her symptoms. (Tr. 53.) Her doctor placed her on medical leave from work due to the symptoms from her impairments and he has yet to find that she is capable of returning to work. (Tr. 50–51.)

Shortly after beginning her medical leave, Johnstone was involved in a car accident. (Tr. 56.) This caused shoulder and hand issues that still affect her life. (Tr. 56.) Johnstone testified that she has pain in both shoulders that radiates down her right arm and typically affects the use of her right hand. (Tr. 49.) She described the pain as feeling like "pins and needles." (Tr. 49.) She is unable to do the mending, open jars or boxes, clean dishes for any length of time, or brush her teeth without an electric toothbrush. (Tr. 60.)

She also described excruciating headaches that occur approximately three to four times a week and last for several hours. (Tr. 57.) In order to cope with the headaches, she must lie down and rest. (Tr. 57.) She also visits a chiropractor, but has never seen a doctor or received a diagnosis relating to her headaches. (Tr. 57–58.)

At the time of the hearing, Johnstone lived in a house by herself, and completed all the household chores. (Tr. 46–47.) Although she is capable of managing the house on her own, she cannot clean the house as often as she would like. (Tr. 47.) She testified that she has, at times, cleared the snow off her front stoop, but that she "pay[s] for it" with "a couple days of agony in [her] shoulder and [her] neck and [her] arm and [her] hand." (Tr. 47.) Johnstone continues to drive, shop for groceries, and manage her money. (Tr. 47–48.) In addition to her household chores, Johnstone participates in a women's group, which meets once a month, and a sewing class. (Tr. 48.)

Johnstone testified that she suffers from anxiety and depression. (Tr. 54.) Every three to four months she sees a psychiatrist, Dr. Michael Eis, who proscribes medications for anxiety. (Tr. 54.) Additionally, her general practitioner, Dr. Boyd, also treats her anxiety and depression. (Tr. 54.) She states that the anxiety and depression cause her to have good days and bad days. (Tr. 54.) On a bad day, which occurs once or twice a week, she does not want to get out of bed and she has little to no energy to accomplish tasks. (Tr. 54; 58.) She typically isolates herself, paces around her home, and fails to care for herself. (Tr. 54.) She stated that she had never been hospitalized for a mental health issue. (Tr. 44.)

While at home, she typically spends about three hours each day in her recliner. (Tr. 55.) Her trouble concentrating causes her to leave water running, burn food, and forget where she places items after cleaning up. (Tr. 55–56.)

## B. Johnstone's Medical Record

On December 22, 2003, Johnstone underwent a sleep study with a continuous positive airway pressure ("CPAP") machine. (Tr. 254–55.) The study revealed that Johnstone suffers from "[o]bstructive sleep apnea which is mild during non-REM sleep and severe during REM sleep." (Tr. 255.)

On March 3, 2004, Dr. Boyd evaluated Johnstone's situational anxiety and depression. (Tr. 211.) He noted that she is seeing Dr. Eis and taking medications, but that she was having a "somewhat impossible situation between work and taking care of her mother. She is very much at loose ends and does not know how to handle all things going on right now." (Tr. 212.) He stated that "[s]ituational anxiety really not making much progress. I suggested a leave of absence, which she will consider.... I fully expect her to be able to come back and do her job [e]ffectively." (Tr. 212.)

On March 5, 2004, Dr. Richard Grunke completed a follow-up visit to discuss Johnstone's use of a CPAP machine while sleeping. (Tr. 215.) Dr. Grunke indicated that Johnstone had some improvement in rest by using the machine. (Tr. 215.)

On March 23, 2004, Dr. Boyd evaluated Johnstone's anxiety, depression and situational reactions in light of Johnstone's leave of absence from work. (Tr. 218.) Dr. Boyd suggested that she continue her leave of absence and check back on April 19, 2004 to discuss returning to work. (Tr. 219.)

On April 19, 2004, Dr. Boyd noted "more situation stress lately." (Tr. 222.) He stated that "she is having just about as much anxiety." (Tr. 222.) He recommended that Johnstone continue her leave of absence, but was hopeful that Johnstone could return to work mid-May. (Tr. 222.)

On May 18, 2004, Dr. Boyd stated that "she is finally starting to feel better. She feels more emotional now that she thinks she is getting better." (Tr. 226.) He also noted that the CPAP machine appeared to be helping with her sleep issues. (Tr. 226.) He further stated that "I think she is definitely improving on a combination of medicine and counseling." (Tr. 227.) He suggested to continue not working, but that he and Johnstone would discuss returning to work at the next appointment. (Tr. 227.)

On June 3, 2004, Dr. Boyd felt that her stress levels had increased, but that overall she had improved quite a bit. (Tr. 229.) Despite the improvement, he did not think that she would be ready to return to work at that time. (Tr. 229.)

On June 24, 2004, Dr. Boyd noted significant anxiety, but that it was possibly improving. (Tr. 231.)

On July 15, 2004, Dr. Boyd noted increased anxiety and stress, possibly due to her sons returning home to live with her. (Tr. 232–33.)

On August 4, 2004, Dr. Boyd discussed Johnstone's plan to travel with her mother. (Tr. 234.) Johnstone stated that she finally felt capable of driving without falling asleep at the wheel. (Tr. 234.) He noted that she was "[q]uite a bit improved from the last time I saw her." (Tr. 235.) He stated that he might clear her to work after the next visit. (Tr. 235.)

On August 25, 2004, Dr. Boyd noted continued improvement in her fatigue and sleepiness. (Tr. 236–37.)

On October 6, 2004, Dr. Boyd stated that Johnstone was making "good progress," but that she was not yet ready to return to work. (Tr. 288.)

On November 18, 2004, Dr. Boyd discussed the stressful events in Johnstone's life, causing him to recommend that Johnstone not return to work at that time. (Tr. 299.)

On December 8, 2004, Dr. Boyd recognized continued anxiety, likely due to Johnstone's son and mother living with her. (Tr. 302.)

On December 29, 2004, Dr. Boyd noted "[w]orsening anxiety," possibly due to Johnstone's mother. (Tr. 303–04.)

At her January 19, 2005 encounter with Dr. Boyd, he mentioned that she had "[s]ome depressive symptoms along with her generalized anxiety disorder." These symptoms included "anhedonia, lack of initiative, low mood and low energy." (305–06.)

On February 9, 2005, Dr. Boyd found that Johnstone was still unable to work due to her generalized anxiety. (Tr. 308.) However, he also noted that she was "[d]isplaying less anxiety then [sic] when I first started treating her." (Tr. 308.)

Dr. Boyd continued to see Johnstone approximately once every three to four weeks. (Tr. 309–19.) He noted minor improvements, but continued to recognize Johnstone's generalized anxiety disorder as an issue. (Tr. 309–19.) Dr. Boyd consistently opined that Johnstone was not yet capable of returning to work due to her anxiety. (Tr. 309–19.)

On May 25, 2005, Johnstone visited Dr. Boyd, who suggested that she "venture out and possibly look for a part-time only position that she may be able to do." (Tr. 322.) However, Johnstone had "a lot of tripidation about going back to work and

. . . she is really worried about what kind of job she could handle." (Tr. 321.)

On June 15, 2005, Dr. Boyd noted that Johnstone was "[d]efinitely improving." (Tr. 324.) However, he renewed his concern about working and did not believe she was capable of maintaining a job at that point. (Tr. 324.)

On July 6, 2005, Dr. Boyd found her anxiety to be "very significant, with some progress being made." (Tr. 326.) Some of the anxiety is attributed to Johnstone's sons moving in with her. (Tr. 325.) On August 11, 2005, an EMG of Johnstone's hands and wrists demonstrated "right sided carpal tunnel syndrome of modest degree." (Tr. 334–35.)

On August 30, 2005, Dr. Boyd continued to find Johnstone unable to work due to her generalized anxiety disorder. (Tr. 380.)

On February 3, 2006, Dr. Eis noted that Johnstone's generalized anxiety disorder was stable, but that she may have been suffering from attention deficit hyperactivity disorder ("ADHD") that had previously gone unrecognized. (Tr. 425.) Dr. Eis referred Johnstone to Peter J. Kenny, Ph. D., for a psychological evaluation. (Tr. 425.)

On February 16, 2006, Dr. Kenny conducted a psychological evaluation of Johnstone. (Tr. 423–24.) He found that Johnstone suffered from a stable generalized anxiety disorder, ADHD, and that any issues with depression were resolved. (Tr. 424.)

On March 3, 2006, Dr. Eis stated that Johnstone's generalized anxiety disorder was stable. (Tr. 422.) He also stated that his diagnosis of Johnstone's ADHD had been confirmed by Dr. Kenny. (Tr. 422.) Dr. Eis initiated Strattera at a low dose to address Johnstone's ADHD. (Tr. 422.)

On March 31, 2006, Dr. Eis found Johnstone's generalized anxiety disorder stable and her ADHD "stable and improved on Strattera." (Tr. 421.) He assigned Johnstone a Global Assessment of Functioning ("GAF") score of 84. (Tr. 421.)

On April 28, 2006, Dr. Eis stated that Johnstone's generalized anxiety disorder was stable, and that her ADHD was "improved but suboptimally treated on current dose of Strattera." (Tr. 420.) He increased her dose and recommended maintenance of her current prescriptions. (Tr. 420.) He assigned Johnstone a GAF score of 86. (Tr. 420.)

On May 31, 2006, Dr. Eis noted that Johnstone's generalized anxiety disorder was stable and her ADHD was "generally improved with Strattera at present dose." (Tr. 419.) He recommended continued use of prescribed medicine and assigned Johnstone a GAF score of 80. (Tr. 419.)

On June 29, 2006, Dr. Eis reported that Johnstone's generalized anxiety disorder was stable and her ADHD was improved. (Tr. 418.) He recommended continued use of prescribed medicine and assigned Johnstone a GAF score of 85. (Tr. 418.)

On August 11, 2006, Dr. Scott Van Steen reviewed an EMG performed on Johnstone. (Tr. 573–74.) He stated that the study "is compatible with a right-sided carpal tunnel syndrome of modest degree" and that "[t]here is no appendicular evidence of cervical radiculopathy." (Tr. 574.)

On September 8, 2006, Dr. Eis reported that Johnstone's generalized anxiety disorder was stable and her ADHD was improved and stable. (Tr. 417.)

On September 19, 2006, Johnstone began therapy sessions with licensed clinical social worker Lonna D. Kannenberg ("Kannenberg"). (Tr. 415.)

On October 4, 2006, Dr. Boyd stated that he did not feel that she was making any progress. (Tr. 516.) He worried about her sleepiness during the day and planned to refer Johnstone to Dr. Nilesh Gupta to reassess her sleeping issues. (Tr. 516.)

On October 23, 2006, Dr. Gupta evaluated Johnstone's sleep issues. (Tr. 521–22.) He noted moderate obstructive sleep apnea, some sleep restriction, and possible restless leg syndrome. (Tr. 522.) He recommended that Johnstone discontinue her use of Lexapro, an antidepressant, because it can cause daytime sleepiness. (Tr. 522.)

On November 2, 2006, Dr. Genevieve Jones reviewed Johnstone's EMG performed on August 11, 2006 and compared the results with Johnstone's symptoms. (Tr. 404.) Dr. Jones found the symptoms indicated by Johnstone to be inconsistent with the data. (Tr. 404.) She noted overall improvement with the use of Gabapentin, so she recommended continued use of the medicine, and planned to follow up in eight weeks. (Tr. 404.)

On November 10, 2006, Kannenberg and Johnstone discussed Johnstone's ADHD and ways to manage her time more effectively. (Tr. 403.) Kannenberg assigned Johnstone a GAF score of 68. (Tr. 403.)

Dr. Eis reported on November 27, 2006 that Johnstone's generalized anxiety disorder was stable and her ADHD was improved and stable on Strattera. (Tr. 402.) He recommended continued use of the already prescribed medicine. (Tr. 402.)

On December 4, 2006, and December 18, 2006, Kannenberg assigned Johnstone a GAF of 66 and recommended time management and meditation strategies. (Tr. 399; 401.)

On January 5, 2007, Dr. Eis noted a deterioration in Johnstone's generalized anxiety disorder due to medication non-

compliance. (Tr. 397.) He also stated that her ADHD had previously improved, but has deteriorated due to medicine non-compliance. (Tr. 397.) Dr. Eis noted that her inability to take prescribed medicine related to an unavailability of samples at his office. (Tr. 397.) Dr. Eis gave her a GAF score of 66. (Tr. 397.)

On January 9, 2007, Dr. Boyd stated that Johnstone's impairments still remain and that "[s]he is on a new medical regimen at this time." (Tr. 383.) He did not indicate the reason for the changed medical regimen. He planned to see her in two months for a recheck. (Tr. 383.)

On February 2, 2007, Dr. Eis, stated that Johnstone's generalized anxiety disorder was stable and her ADHD had improved. (Tr. 395.) Dr. Eis assigned Johnstone a GAF score of 67. (Tr. 395.) On February 2, 2007, Kannenberg discussed issues relating to stressors in Johnstone's life. (Tr. 396.) Kannenberg assigned Johnstone a GAF score of 66. (Tr. 396.)

On February 19, 2007, Kannenberg noted improvements in Johnstone's mood and physical wellbeing. (Tr. 394.) She assigned Johnstone a GAF score of 67. (Tr. 394.)

On March 18, 2007, Dr. Boyd stated that Johnstone still had severe anxiety. (Tr. 475.) He further stated that "[s]he is feeling better, but she is not able to work." (Tr. 475.)

On April 19, 2007, Eric Edelman, Ph.D., completed a psychiatric review of Johnstone. (Tr. 430–43.) Dr. Edelman noted that Johnstone suffered from ADHD, depressive disorder not otherwise specified, and a generalized anxiety disorder. (Tr. 431–35.) Dr. Edelman found Johnstone mildly limited in activities of daily living and her ability to maintain social functioning. (Tr. 440.) He found her moderately limited in her ability to maintain concentration, persistence, or pace. (Tr. 440.) He noted no episodes of decompensation. (Tr. 440.)

The same day, Dr. Edelman completed a Mental Residual Functional Capacity ("RFC") Assessment form. (Tr. 444–47.) Edelman found Johnstone moderately limited in her ability to (1) "understand and remember detailed instructions;" (2) "carry out detailed instructions;" (3) "maintain attention and concentration for extended periods;" (4) "perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances;" (5) "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods;" (6) "respond appropriately to changes in the work setting;" and (7) "set realistic goals or make plans independently of others." (Tr. 444–45.) Dr. Edelman found Johnstone "not significantly limited" in every other category. (Tr. 444–45.)

On April 20, 2007, Dr. Pat Chan completed a Physical RFC Assessment. (Tr. 448–55.) Dr. Chan stated that Johnstone could occasionally lift or carry fifty pounds and could frequently lift or carry twenty-five pounds. (Tr. 449.) He found her capable of standing or walking for about six hours in an eight-hour workday and sitting for about six hours in an eight-hour workday. (Tr. 449.) Her ability to push or pull was noted as unlimited. (Tr. 449.) Dr. Chan indicated no limitations with regard to postural limitations, visual limitation, communicative limitations, and environmental limitations. (Tr. 450–53.) He did note, however, that Johnstone was limited in her ability to reach. (Tr. 451.) He explained that Johnstone "is restricted from reaching and lifting overhead as this causes pain in Left Shoulder." (Tr. 451.)

He did not indicate any other manipulative limitations. (Tr. 451.)

On May 18, 2007, Dr. Eis indicated that Johnstone's generalized anxiety disorder and ADHD were improved and stable. (Tr. 457.) He assigned her a GAF score of 68. (Tr. 457.)

On June 4, 2007, July 31, 2007, September 18, 2007, and November 23, 2007, Dr. Boyd continued to find Johnstone incapable of working due to her anxiety. (Tr. 477.)

On September 18, 2007, Dr. Boyd wrote a letter supporting his conclusion that Johnstone was incapable of working. (Tr. 576.)

On November 5, 2007, Dr. Michael Baumblatt affirmed the RFC assessment by Dr. Chan. (Tr. 485.)

On November 8, 2007, Dr. Roger Rattan affirmed the mental RFC assessment by Dr. Edelman. (Tr. 486.)

On January 10, 2008, Dr. Gupta indicated moderate obstructive sleep apnea and daytime sleepiness. (Tr. 537–38.) He commented that the daytime sleepiness may be caused by Straterra and a switch to Ritalin may be appropriate. (Tr. 538.)

On February 21, 2008, Dr. Boyd noted that "[s]he is doing well with [Ritalin] but it is too expensive." (Tr. 543.)

On April 21, 2008, Dr. Boyd completed a medical assessment form that discussed Johnstone's "chronic anxiety" and depression. (Tr. 487.) He indicated that her prognosis was "poor." (Tr. 487.) He stated that Johnstone would suffer from symptoms that would interfere with her attention and concentration frequently, that she would be unable to perform or be exposed to public contact, routine, repetitive tasks at a consistent pace, detailed or complicated tasks, close interaction with coworkers, or fast-paced tasks. (Tr. 488.) Dr. Boyd

indicated that Johnstone is severely limited in her ability to work with others and to accept instructions and respond appropriately to criticism from supervisors. (Tr. 491.) He stated that her limitations are moderately severe in the categories of maintaining attention and concentration for at least two straight hours, completing a normal workday without interruptions from symptoms, interacting appropriately with the general public, and dealing with stress. (Tr. 491.) The remaining categories dealing with Johnstone's ability to remember and carry out instructions were described as only "limited." (Tr. 491.)

With regard to physical impairments, Dr. Boyd noted that Johnstone could walk at most five city blocks, sit for more than two hours, and stand for thirty minutes. (Tr. 488.) He stated that she could sit for about four hours and stand or walk for at least six hours in an eight-hour workday. (Tr. 489.) However, Johnstone would require at least ten unscheduled breaks during the workday due to her impairments. (Tr. 489.) He stated that Johnstone could not lift more than twenty pounds, could rarely lift ten pounds, and could occasionally lift less than ten pounds. (Tr. 489.) He indicated some environmental restrictions and also stated that Johnstone would, on average, be absent from work more than four days a month due to her impairments. (Tr. 490.)

On August 25, 2008, Dr. Boyd stated that Johnstone had "improved quite a bit with treatment for her anxiety disorder. I do not feel she is able to work." (Tr. 552.)

On January 11, 2009, Dr. Boyd stated that her "anxiety disorder is worse at this present time" and continued to see Johnstone once every two months. (Tr. 557.)

On February 6, 2009, Dr. Gupta noted continued moderate obstructive sleep apnea. (Tr. 561.) However, he found that

her "daytime sleepiness has significantly improved." (Tr. 561.)

On December 21, 2009, Dr. Boyd completed a mental impairment medical assessment form that indicated that Johnstone suffered from (1) decreased energy/chronic fatigue; (2) blunt, flat or inappropriate affect; (3) generalized persistent anxiety; (4) sleep disturbance; (5) recurrent panic attacks; and (6) anhedonia. (Tr. 577.) In his opinion, these impairments would cause Johnstone to be absent from work more than four days a month. (Tr. 577.) In terms of her functional limitations, Dr. Boyd found that she had no restrictions on activities of daily living, was markedly limited in her ability to maintain social functioning, was extremely limited in her ability to maintain concentration, persistence or pace, and had three repeated episodes of decompensation. (Tr. 578.) The remainder of the form discussed the degree to which the individual's impairment would impact his or her workday and is consistent with Dr. Boyd's prior opinion, dated April 21, 2008. (Tr. 579.)

On July 14, 2010, Dr. Eis was asked to comment on whether Dr. Boyd's opinion of Johnstone's symptoms and limitations were "reasonably consistent with the medical signs and findings." (Tr. 581.) In his opinion, Johnstone did not have a marked limitations in maintaining social functioning. (Tr. 581.) However, he indicated that she does have "at least marked difficulties in maintaining concentration, persistence or pace," "significant anticipated impairment-related absenteeism," and "various nonexertional limitations." (Tr. 581.)

## C. Vocational Expert's Testimony

Catherine A. Anderson ("Anderson") testified at the hearing as a VE. (Tr. 62.) Anderson first summarized Johnstone's relevant past work history as a billing clerk and an office clerk general. (Tr. 64.) She defined the prior positions as semi-skilled, sedentary work. (Tr. 63–64.)

The ALJ then presented a hypothetical person to Anderson for her opinion on whether any positions exist for this person. (Tr. 65.) The ALJ described the hypothetical individual as "a person of the claimant's age, education and work experience who can perform work at the medium level as defined by the regulations, but who is limited to no more than occasional . . . overhead reaching with the right upper extremity." (Tr. 65.) The individual is further "limited to work involving simple, routine, or repetitive tasks." (Tr. 65.) Anderson opined that the restrictions would preclude all past relevant work because the SVP level would be too high. (Tr. 65.) However, Anderson stated that the hypothetical person could perform the requirements of an office clerk general, a position in food preparation, work as a packer/packager, or a position in housekeeping, which amounted to approximately 15,200 positions in Wisconsin. (Tr. 65–66.) Each position is classified as medium, unskilled work with an "SVP of 2 or below." (Tr. 65–66.)

The ALJ then provided the same hypothetical person with additional limitations of "no more than frequent handling or fingering with the . . . right upper extremity," and only simple, routine, repetitive tasks in an environment that is "free of fast paced production requirements involving only simple work-related decisions with few if any workplace changes, and with only occasional interaction with the public, co-workers and supervisors." (Tr. 66.) The additional limitations precluded all previous work, and the packer/packager position. (Tr. 68.) However, the hypothetical person could still complete all the

requirements of a housekeeping position and could complete the requirements of a food preparation position, but at a reduced number of only 1,750 positions instead of 3,500, due to the fast-paced nature of some of the food preparation positions. (Tr. 66–67.) Additionally, the positions available to the individual as an office clerk general would be decreased by fifty percent, to 350 positions, due to the fast-paced nature of some of the positions. (Tr. 68.) The total positions available would therefore be reduced to 5,600. (Tr. 66–68.)

Finally, the ALJ stated the following: "let's assume that due to a combination of medical conditions, associated pain, fatigue and mental impairments this person is unable to engage in sustained work activity on a regular and continuing basis for eight hours a day, five days a week, for a 40–hour workweek or an equivalent work schedule. Would competitive work at all exertional levels be precluded for such an individual?" (Tr. 68.) In response to the ALJ's question, Anderson stated that all competitive work would be precluded for the hypothetical individual. (Tr. 68.)

The ALJ then asked whether Anderson's testimony was consistent with the Dictionary of Occupational Titles ("DOT"). (Tr. 69.) Anderson verified that it was consistent. (Tr. 69.)

Johnstone's attorney, David Rice ("Rice"), then asked Anderson a few questions. First, he verified that the jobs listed by Anderson were "medium level jobs" and that a "medium level job" required a person to be on his or her feet "essentially all day" and have the capability to lift up to fifty pounds. (Tr. 69.) Rice discussed the limitations Dr. Boyd placed on Johnstone that exceeded those provided in the ALJ's hypotheticals. (Tr. . 69–71.) Anderson testified that there would be no positions available to an individual with the

additional limitations, as provided by Dr. Boyd. (Tr. 69–71.)

Rice then asked Anderson for the specific DOT numbers that correspond to the four positions Anderson identified as available to an individual with Johnstone's limitations, which Anderson provided. (Tr. 71–72.)

## D. ALJ's Decision

The ALJ must follow the required five-step sequential evaluation to determine a claimant's disability status. 20 C.F.R. § 416.920. At the first step, the ALJ must determine if the claimant is engaged in substantial gainful activity. 20 C.F.R. § 416.920(a)(4)(i). If so, the claimant is not disabled. *Id.* Here, Johnstone had not engaged in substantial gainful activity since her alleged onset date of March 5, 2004, so the ALJ moved forward to step two. (Tr. 19.)

Under step two, the ALJ determines whether an impairment is "severe," meaning that the impairment significantly limits an individual's ability to perform basic work activities. 20 C.F.R. § 416.920(a)(4)(ii); *see also* 20 C.F.R. § 416.921. Here, the ALJ determined that Johnstone's severe impairments include degenerative disk disease of the cervical spine with cervicalgia, generalized anxiety disorder, depression, and obstructive sleep apnea. (Tr. 19.)

In evaluating a claimant's impairments under step three, an ALJ must determine if the severe impairments listed in step two meet or equal the requirements of any listed section or any part of the List of Impairments found in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listings"). 20 C.F.R. § 416.920(a)(4)(iii). Here, The ALJ found that Johnstone's impairments did not meet or equal the impairments found in the Listings. (Tr. 23.) Johnstone did not qualify as "disabled" under step three,

so the ALJ continued his analysis to step four. (Tr. 23–24.)

At step four, the ALJ must determine whether the claimant has the capacity to return to his previous work. 20 C.F.R. § 416.920(a)(4)(iv). Johnstone's past relevant work included a billing clerk, accounts adjustable clerk, and general office clerk, which were classified as semiskilled, sedentary positions. (Tr. 25.) The ALJ found that Johnstone was precluded from returning to any previously held positions based on the RFC assigned by the ALJ, so the ALJ proceeded to step five. (Tr. 25.)

At step five, the final step, the ALJ must evaluate the claimant's capability of doing other work by determining the claimant's RFC. An ALJ determines a claimant's RFC by considering the claimant's capacity, age, education, work experience, and any limitations caused by impairments. 20 C.F.R. § 416.920(a)(4)(v). The ALJ found Johnstone to be an individual of "advanced age," with at least a high school education, and capable of speaking in English. (Tr. 25–26.) Based on the record, the ALJ found Johnstone capable of performing a range of medium work, but restricted the use of her right upper extremity to reaching overhead only occasionally and performing fingering and handling only frequently. (Tr. 20.) Additionally, "she is limited to work involving simple, routine and repetitive tasks in a work environment free from fast-paced production requirements and that requires only simple work-related decisions with few, if any, work place changes." (Tr. 20.)

During the hearing, the ALJ presented the VE with a hypothetical person with Johnstone's age, education, work experience, and RFC. (Tr. 66–68.) The VE then testified that an individual with the limitations mentioned above could perform the requirements of occupations such as housekeeper, food preparer, and general office clerk. (Tr. 26.) This amounted to approximately 5,600 jobs available in Wisconsin for a person with Johnstone's limitations. (Tr. 26.) Based on the VE's testimony, the ALJ concluded that "the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy," and that Johnstone is therefore "not disabled." (Tr. 26.)

The ALJ found that Johnstone "has not been under a disability, as defined in the Social Security Act, at any time from March 5, 2004 through the date of this decision (20 C.F.R. 404.1520(g))." (Tr. 26.) He therefore denied Johnstone's application for disability insurance benefits. (Tr. 27.)

## IV. STANDARD OF REVIEW

■ Review of the Commissioner's decision is limited. The Social Security Act states that "[t]he findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Reversal is warranted only if the Commissioner's findings lack support by substantial evidence. *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir.1996). Additionally, if the ALJ commits an error of law, reversal is required unless the error is harmless. *Keys v. Barnhart*, 347 F.3d 990, 994–95 (7th Cir.2003). An ALJ commits an error of law if his decision fails to comply with the Commissioner's regulations and rulings. *Brown v. Barnhart*, 298 F.Supp.2d 773, 779 (E.D.Wis.2004).

■ Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). Where conflicting evidence allows reasonable minds to differ in determining whether the claimant is entitled to

benefits, the responsibility for that decision rests with the Commissioner. *Schoenfeld v. Apfel,* 237 F.3d 788, 793 (7th Cir.2001). In reviewing the Commissioner's decision for a substantial evidence determination, a court reviews the entire administrative record, but may not reweigh the evidence, decide the facts anew, resolve conflicts or substitute its own judgment for that of the Commissioner. *Clifford v. Apfel,* 227 F.3d 863, 869 (7th Cir. 2000). The Commissioner need not provide a written evaluation of each piece of evidence, however, a "minimum articulation" of evidentiary findings is necessary. *Walker v. Bowen,* 834 F.2d 635, 643 (7th Cir.1987).

## V. DISCUSSION

In order to qualify for disability insurance benefits the claimant must be "disabled." The Social Security Act defines "disabled" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The disability must be sufficiently severe that the claimant cannot return to his prior job and is not capable of engaging in any other substantial gainful work that exists in the national economy. 42 U.S.C. § 423(d)(2)(A).

■ The ALJ must conduct a five-step evaluation when deciding whether the claimant is disabled. 20 C.F.R. § 416.920(a)(4). This includes determining whether (1) the claimant is currently employed; (2) the claimant has a severe impairment; (3) the claimant's impairment meets or equals one of the impairments listed by the Commissioner in the Listings; (4) the claimant can perform past relevant work; and (5) the claimant is capable of

performing work in the national economy. *Clifford,* 227 F.3d at 868. Under this sequential process, "[a]n affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler,* 760 F.2d 160, 162 n. 2 (7th Cir.1985) (citation omitted). The burden rests on the claimant until the evaluation reaches step five, where the burden shifts to the ALJ to demonstrate that the claimant is capable of performing work in the national economy. *Zurawski v. Halter,* 245 F.3d 881, 886 (7th Cir.2001).

Johnstone argues that the ALJ made the following four errors in his decision: (1) "the ALJ failed to properly evaluate the opinions of Dr. Boyd;" (2) "the ALJ's conclusion that Ms. Johnstone can perform medium level work and lift/carry items weighing 50 pounds is not supported by substantial evidence;" (3) "the ALJ failed to properly evaluate Ms. Johnstone's symptoms of severe daytime fatigue;" and (4) "the ALJ improperly relied on the VE's testimony about jobs even though the VE's testimony concerning specific jobs conflicts with the DOT's description of those jobs." (Pl.'s Br. 7–16.) The court will address each argument below.

### A. Treating Physician's Opinion

■ Generally, the ALJ gives more weight to opinions from a claimant's treating physician because the physician has a greater familiarity with the claimant's conditions and circumstances over a period of time. 20 C.F.R. § 404.1527(d)(2). If a treating physician's opinion on "the nature and severity of an individual's impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the

other substantial evidence in the case record, the [ALJ] must give it controlling weight." SSR 96–8p, 1996 WL 374184 (July 2, 1996). An opinion that is not entitled to controlling weight need not be rejected. Instead, the opinion is entitled to deference and the ALJ must weigh the opinion using several factors including the length, nature, and extent of the claimant's relationship with the treating physician; whether the opinion is supported by relevant evidence; the opinion's consistency with the record as a whole; and whether the physician is a specialist. 20 C.F.R. § 404.1527(d); *see also Ramos v. Astrue,* 674 F.Supp.2d 1076, 1087 (E.D.Wis.2009). The ALJ must give "good reasons" to support the weight she ultimately assigns to the treating physician's opinion. 20 C.F.R. § 404.1527(d)(2).

Additionally, an ALJ must keep in mind that "a person who suffers from a mental illness will have better days and worse days, so a snapshot of a single moment says little about her overall condition." *Punzio v. Astrue,* 630 F.3d 704, 710 (7th Cir.2011). An ALJ must therefore analyze whether a treating physician's RFC assessment is "consistent with her treatment notes as a whole." *Id.*

Looking at Dr. Boyd's treatment notes as a whole, his RFC assessment is consistent with his treatment of Johnstone. Dr. Boyd continually stated that he felt she would be unable to return to work, even when her stress and generalized anxiety appeared to be improving. He never once stated that her generalized anxiety disorder had improved to the point that he would clear her to begin working. Although she may have had improvements, Dr. Boyd's treatment notes indicate that, in his opinion, Johnstone would be incapable of working a regular job due to the symptoms of her generalized anxiety disorder.

The inconsistencies that the ALJ points to include the assessments by state agency medical consultants, which indicated that Johnstone was capable of performing "a range of routine, unskilled medium work." (Tr. 25.) The ALJ assigned "significant weight to their assessments of the claimant's impairments, as they are generally consistent with the entire record." (Tr. 25.) However, the ALJ failed to discuss how the assessments were inconsistent with Dr. Boyd's assessment that Johnstone had marked difficulties maintaining concentration and that Johnstone would miss approximately four days per month due to her symptoms. In fact, Dr. Edelman noted moderate limitations in Johnstone's ability to (1) maintain concentration, persistence, or pace; (2) carry out detailed instructions; (3) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and (4) complete a normal workday and workweek without interruptions from symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 444.) This comparison demonstrates that although Dr. Boyd opined that Johnstone was more limited than Dr. Edelman's assessment, both doctors agree that Johnstone does suffer from certain limitations caused by her symptoms.

Additionally, Dr. Boyd's assessment was confirmed by Dr. Eis, Johnstone's treating psychiatrist. Dr. Eis agreed with Dr. Boyd's RFC assessment by indicating that Johnstone does have "at least marked difficulties in maintaining concentration, persistence or pace," "significant anticipated impairment-related absenteeism," and "various nonexertional limitations." (Tr. 581.) The court notes, however, that the assessment provided by Dr. Eis was submitted on July 14, 2010. This is well after the hearing and decision in this case. It is

also beyond the period for which Johnstone seeks disability benefits in this appeal.[1] However, it is further evidence that Dr. Boyd's assessment of Johnstone's mental impairments is not inconsistent with the opinions of other physicians treating Johnstone during the same period.

Based on a review of the entire record, Dr. Boyd's opinion is not inconsistent with the record, and the ALJ should have assigned Dr. Boyd's opinion controlling weight. If the ALJ had given Dr. Boyd's opinion controlling weight, the ALJ would likely have found Johnstone disabled. This is because the VE testified that there would be no positions available to an individual with the additional limitations provided by Dr. Boyd's assessment. (Tr. 69–71.)

I will therefore reverse and remand the ALJ's decision with respect to the weight given to Dr. Boyd's opinion regarding the limitations Johnstone experiences as a result of her mental impairments.

In addition to a mental evaluation, Dr. Boyd also issued a medical assessment relating to Johnstone's physical capabilities. The ALJ discounted Dr. Boyd's opinion regarding Johnstone's physical limitations because Dr. Boyd "treats the claimant for only mental conditions." After reviewing the record, the court finds that the ALJ's decision not to assign Dr. Boyd's opinion controlling weight is not erroneous. Dr. Boyd's opinion regarding Johnstone's physical limitations is not well-supported and his opinion is inconsistent with the record. In fact, those reviewing Johnstone's EMG result found carpal tunnel syndrome of a moderate degree and no other impairments. Thus, the ALJ's decision not to assign Dr. Boyd's opinion of Johnstone's physical limitations controlling weight is affirmed.

However, an ALJ may not cast a treating physician's opinion aside if the ALJ decides that the opinion is not controlling. Instead, an ALJ must weigh the factors listed in 20 C.F.R. § 404.1527(d) and provide good reasons for the weight ultimately assigned to the treating physician's opinion. Here, the ALJ did not weigh the factors provided in § 404.1527(d) when discounting Dr. Boyd's opinion. There are reasons to provide Dr. Boyd's opinion more than little weight, which may have been revealed had the ALJ completed an analysis of the factors. Specifically, although the majority of Dr. Boyd's treatment of Johnstone involved mental impairments, Dr. Boyd was Johnstone's primary care physician. Additionally, she maintained regular office visits with Dr. Boyd from March 2004 through the present. The ALJ failed to evaluate Johnstone's frequent visits and long-lasting relationship with Dr. Boyd. This type of relationship warrants consideration when determining the type of weight ultimately assigned to a doctor's opinion.

The ALJ committed a legal error by failing to evaluate the factors under 20 C.F.R. § 404.1527(d). This error is not harmless because reliance on Dr. Boyd's opinion regarding the amount of weight Johnstone can carry could preclude any potential jobs available to Johnstone. I will therefore reverse the ALJ's decision with regard to Dr. Boyd's opinion and remand for further proceedings.

---

1. Originally, Johnstone sought disability benefits from March 5, 2004 to the present. However, in a decision dated June 30, 2011, ALJ William Zellman issued a favorable decision approving Johnstone's claim for social security income disability benefits as of February 12, 2010. Johnstone therefore filed a motion to modify her claim before this court to a closed period from March 5, 2004 to February 12, 2010, which was granted on August 2, 2011.

## B. Johnstone's Ability to Regularly Lift/Carry Items Weighing Fifty Pounds

The ALJ found that Johnstone had not been disabled from March 2004 through the date of the ALJ's decision because she was capable of performing a "full range of medium work." Medium work is defined as "involv[ing] lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 404.1567(c). Johnstone argues that the ALJ's finding that Johnstone is capable of performing "medium" work is erroneous because Johnstone cannot meet the lifting requirements described in 20 C.F.R. § 404.1567(c). Johnstone bases this argument on Dr. Boyd's assessment severely limiting Johnstone's lifting capabilities.

The court has already determined that the ALJ must reconsider the weight assigned to Dr. Boyd's opinion. After re-evaluating the proper weight to be given to Dr. Boyd's opinion, the ALJ should then determine whether the evidence supports a finding that Johnstone is capable of regularly lifting or carrying fifty pounds.

Additionally, the ALJ found Johnstone's testimony that she cannot lift or carry more than ten pounds incredible. He found that Johnstone did not seek treatment for the pain in her neck and shoulder. However, an ALJ may not use a claimant's lack of medical care to support an adverse credibility finding unless that ALJ "has explored the claimant's explanations as to the lack of medical care." *Craft v. Astrue,* 539 F.3d 668, 679 (7th Cir.2008); SSR 96–7p, 1996 WL 374186 (July 2, 1996).

Here, the ALJ did not inquire into Johnstone's failure to seek treatment, despite evidence that Johnstone did not have insurance and was, at times, unable to pay for prescription medication. For example,

there is documentation that although one type of medicine was helping with daytime fatigue, Johnstone was unable to continue using it due to the expense. Thus, the ALJ should have inquired into Johnstone's reasons for not seeking treatment for her shoulder and neck problems.

The court will therefore reverse the ALJ's determination that Johnstone is able to regularly lift and/or carry fifty pounds. I will remand this issue to the ALJ to make a determination in light of this decision.

## C. Symptoms of Severe Daytime Fatigue

When a claimant testifies regarding symptoms from his impairment, the ALJ must evaluate the credibility of the claimant's testimony. 20 C.F.R. § 404.1529(c)(3). A credibility finding is entitled to deference and will only be disturbed if "patently wrong" in light of the record. *Powers v. Apfel,* 207 F.3d 431, 435 (7th Cir.2000). Despite this deferential standard, "the ALJ must consider the claimant's level of pain, medication, treatment, daily activities, and limitations, 20 C.F.R. § 404.1529(c), and must justify the credibility finding with specific reasons supported by the record, *Villano* [*v. Astrue* ], 556 F.3d [558, 562 (7th Cir.2009) ]." *Terry v. Astrue,* 580 F.3d 471, 477 (7th Cir.2009); *see also* SSR 96–7p (listing the seven factors a decisionmaker must consider when evaluating the claimant's credibility with regard to pain or other nonexertional limitations).

Johnstone argues that in finding her complaint of daytime sleepiness incredible, the ALJ erred by ignoring the effects of medications, in violation of SSR 96–7p. Specifically, SSR 96–7p provides that an ALJ must consider, at the very least, the seven factors enumerated in the regulation. 1996 WL 374186, at *3. Factor

four requires the ALJ to consider "[t]he type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms." *Id.* There is significant evidence that Johnstone sought help for daytime fatigue and those evaluating her symptoms repeatedly cited prescription medicine as a likely source of her fatigue. By deciding not to address this information under the factors listed in SSR 96–7p, the ALJ made a legal error. The error is not harmless because the conclusion drawn from a thorough analysis of the factors may support the assertion that Johnstone cannot sustain concentration or may suffer from excessive absenteeism, which would reduce or eliminate the jobs available to Johnstone. I will therefore reverse the ALJ's credibility determination and remand the case for further proceedings.

### D. Reliance on the VE's Testimony

 Challenging the reliability of the VE's testimony is essentially a challenge that the ALJ failed to provide evidence during step-five that establishes that the claimant can perform other work that "exists in significant numbers in the national economy." 20 C.F.R. § 404.1560(c)(2). When an ALJ relies on a VE's testimony to satisfy this burden, the testimony must be reliable. *Donahue v. Barnhart,* 279 F.3d 441, 446 (7th Cir.2002). "A finding based on unreliable VE testimony is equivalent to a finding that is not supported by substantial evidence and must be vacated." *Britton v. Astrue,* 521 F.3d 799, 803 (7th Cir.2008).

SSR 00–4p, 2000 WL 1898704, at *4 (Dec. 4, 2000), provides the following guidance to ALJs when utilizing a VE's testimony at Step Five:

> When a VE or VS provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE or VS evidence and the information provided in the DOT. In these situations, the adjudicator will:
>
>> Ask the VE or VS if the evidence he or she has provided conflicts with information provided in the DOT; and
>>
>> If the VE's or VS's evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation of the apparent conflict.

The ruling continues on to describe the ALJ's responsibilities in explaining the resolution of a conflict:

> When vocational evidence provided by a VE or VS is not consistent with information in the DOT, the adjudicator must resolve this conflict before relying on the VE or VS evidence to support a determination or decision that the individual is or is not disabled. The adjudicator will explain in the determination or decision how he or she resolved the conflict. The adjudicator must explain the resolution of the conflict irrespective of how the conflict was identified.

SSR 00–4p, at *4.

At the close of the VE's testimony, the ALJ asked the VE whether her testimony was consistent with the DOT. (Tr. 69.) She verified that it was. (Tr. 69.) This would be sufficient under the regulation discussed above. However, upon cross-examination, the VE provided the corresponding DOT numbers to Johnstone's attorney, who then researched the requirements of each job, as listed in the DOT. (Tr. 71–72.) Johnstone's attorney then submitted a post-hearing brief to the ALJ highlighting job titles that he considered inconsistent with the VE's testimony. (Tr. 204.)

In the letter, Johnstone argues that the reasoning level of all four jobs identified

by the VE require a reasoning level of 2, which involves following detailed instructions. (Tr. 204.) However, Dr. Boyd opined that Johnstone "cannot handle 'detailed' instructions." (Tr. 204.) She also argued that the DOT indicates that the job of "packer" and "food prep" involve constant fingering and handling, but that the ALJ limited Johnstone's abilities to only frequent use of her right hand and no fast paced work. (Tr. 204.)

■ Johnstone's letter brought potential inconsistencies to light. However, the ALJ failed to resolve the apparent conflict in his decision. By not addressing the inconsistencies, the ALJ could not properly rely on the VE's testimony. I will therefore reverse the ALJ's decision as it relates to his reliance on conflicting VE testimony.

### E. Remedy

■ Johnstone asks the court to reverse the ALJ's decision and award disability insurance benefits without remanding the action. Alternatively, Johnstone asks the court to reverse and remand for further proceedings. Generally, the appropriate remedy when an ALJ's decision is reversed is a remand for further proceedings. *Gotz v. Barnhart*, 207 F.Supp.2d 886, 901 (E.D.Wis.2002). However, the following two exceptions exists: (1) "where the record overwhelmingly supports a finding of disability"; and (2) "where the delay involved in repeated remands has become unconscionable, or the agency has displayed obduracy in complying with the law as set down by the court." *Worzalla v. Barnhart*, 311 F.Supp.2d 782, 800 (E.D.Wis.2004).

■ Neither exception applies here. The record does not overwhelmingly support a finding of disability. Additionally, the majority of this appeal concerns the credibility determinations of the plaintiff and the weight assigned to Johnstone's treating physician. These issues are most adequately addressed by the ALJ presiding over the hearings. The ALJ should therefore be given the opportunity to reconsider the matter in light of the foregoing discussion and the new evidence presented. Additionally, because this is Johnstone's first § 405(g) appeal and because there is no indication that the Social Security Administration refused to apply the law to her claim, the second exception is inapplicable. Therefore, the effect of the ALJ's error warrants a remand under sentence four of § 405(g), without an award of benefits.

In the event of remand, as is the situation here, Johnstone requests that her case be assigned to a different ALJ. Generally, the court has no power to order that a case be heard by a different ALJ upon remand. *Sarchet v. Chater*, 78 F.3d 305, 309. However, "[i]f there is sufficient evidence of bias to entitle the claimant to review by a different administrative law judge, ... then the transfer of the case to a different administrative law judge is an automatic consequence of reversal." *Id.*

Johnstone does not argue that the ALJ issuing the decision in her case was biased. However, she does argue that the ALJ's failures, as described above, warrant a new ALJ "to preserve the appearance of fairness." *See Id.*, 78 F.3d 305, 309 (7th Cir. 1996) (remanding to a different ALJ because the "tone of the [ALJ's] opinion suggests that she may have an unshakable commitment to the denial of this applicant's claim."); *Windus v. Barnhart*, 345 F.Supp.2d 928, 946 (E.D.Wis.2004) (remanding to different ALJ for making unsupported findings based on laundry list of activities of daily living).

I will not recommend that a different ALJ be assigned to Johnstone's case. The

ALJ should be given an opportunity to remedy the mistakes made in his previous decision. This is particularly appropriate in light of the court's reliance on a document dated after the ALJ issued his decision. I will therefore remand the case without a recommendation to assign a different ALJ.

**NOW THEREFORE IT IS ORDERED** that the decision of the Commissioner be and hereby is **REVERSED** and this action is **REMANDED** for further proceedings consistent with this decision;

**IT IS FURTHER ORDERED** that the clerk of court enter judgment accordingly.